Nathan R. Ring
Nevada State Bar No. 12078
**STRANCH, JENNINGS & GARVEY PLLC**
3100 W. Charleston Blvd., Ste. 208
Las Vegas, Nevada 89102
(725) 235-9750
nring@stranchlaw.com

Grayson Wells*
John C. Roberts*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gwells@stranchlaw.com
jroberts@stranchlaw.com

Melissa R. Emert*
Gary S. Graifman*
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Road
Montvale, New Jersey 07645
Telephone: (201) 391-7000
Facsimile: (201) 307-1086
memert@kgglaw.com
ggraifman@kgglaw.com
*Pro Hac Vice Application forthcoming*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| COSIMO GRANATA, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BOYD GAMING CORPORATION and PALA INTERACTIVE LLC, | |
| Defendants. | |

Class Action Complaint

Upon personal knowledge as to his own acts, and based upon his investigation, the investigation of counsel, and information and belief as to all other matters, Plaintiff Cosimo Granata, on behalf of himself and all others similarly situated, alleges as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action against Boyd Gaming Corporation ("Boyd") and its wholly owned subsidiary Pala Interactive LLC ("Pala") (together, "Defendants") for their failure to adequately secure and safeguard Plaintiff's and millions of other individuals' personally identifiable information ("PII"), including names, Social Security numbers, and dates of birth.

2.      Defendant Boyd Gaming Corporation is a diversified gaming and entertainment company headquartered in Nevada that owns and operates numerous casinos and gaming properties throughout the United States, as well as online gaming platforms developed and maintained by its subsidiary, Pala.

3.      Defendant Pala Interactive LLC is an online gaming and technology company that provides internet and mobile gaming platforms and related infrastructure for Boyd's online gaming operations. Pala collects, stores, and processes customer data on behalf of Boyd in connection with those services.

4.      Plaintiff received a data breach notice from Pala Interactive dated September 24, 2025, informing him that his personal information had been compromised in a cybersecurity incident affecting Pala's systems. On information and belief, Pala maintained this data in connection with Boyd's online gaming platforms and related customer accounts.

5.      This case arises from Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information they collected and stored. Pala's deficient cybersecurity measures allowed unauthorized access to customer data, and Boyd failed to ensure that its subsidiary maintained adequate safeguards to protect that information.

6.      On information and belief, the Data Breach resulted in the unauthorized access and exfiltration of personally identifiable information of hundreds of thousands of individuals, including Plaintiff, and potentially millions of Boyd customers nationwide.

7.      Because Pala operates as a data and technology arm of Boyd's gaming operations, the breach's impact extends across multiple Boyd customer databases and platforms, exposing sensitive data beyond online players to other Boyd patrons whose information was integrated into shared systems managed by Pala.

8.      The Data Breach was directly and proximately caused by Defendants' failure to implement reasonable and industry-standard data security practices necessary to protect their systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the sensitive PII of millions of individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

9.      By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security.

10.     Defendants failed to disclose in its Data Breach notice when the Data Breach occurred.

11.     Despite knowing that the Data Breach occurred, Defendants Boyd and Pala have not publicly disclosed sufficient information regarding the nature, cause, and scope of the incident. Defendants have failed to explain how unauthorized third parties gained access to their systems, the specific vulnerabilities that were exploited, whether and to what extent the compromised data was encrypted or anonymized, or what specific remedial measures have been implemented to prevent

future breaches. Defendants have also not disclosed the total number of individuals affected or provided details sufficient to allow victims to assess the full extent of their risk. Their lack of transparency has exacerbated the harm to Plaintiff and Class Members and constitutes a violation of their duties under state data breach notification statutes and general principles of reasonable care. Without these critical details, Plaintiff and Class Members cannot meaningfully mitigate the ongoing and future risks associated with the Data Breach.

12.    Boyd and Pala represented to customers that their personal information would be protected through reasonable and industry-standard data security measures. Boyd, as the parent company and ultimate operator of the gaming and data infrastructure, and Pala, as its online gaming subsidiary responsible for the collection and storage of sensitive customer information, owed duties to implement and maintain adequate cybersecurity practices. These duties included safeguarding personal data from unauthorized access, promptly detecting and responding to security incidents, and timely notifying affected individuals of any breach. Defendants failed to fulfill these obligations.

13.    Plaintiff is a victim of the Data Breach and received a written notice dated September 24, 2025, from Pala Interactive informing him that his personal information had been compromised. Upon information and belief, this data was collected, maintained, and controlled by Boyd and its subsidiary Pala in connection with Boyd's gaming operations. Plaintiff is a resident and citizen of New Jersey who had no reason to expect that the personal information he provided to Defendants would be inadequately protected or subject to unauthorized disclosure.

14.    As a result of Defendants' conduct and the resulting Data Breach, Plaintiff's and Class Members' privacy has been invaded, and their PII is now in the possession of unauthorized third parties. Plaintiff and Class Members have suffered or face an imminent and continuing risk of identity theft, fraud, and other misuse of their personal information. They have incurred, and will continue to incur, significant time and expenses to monitor their accounts, protect their identities, and mitigate the consequences of Defendants' failures.

15.    Plaintiff, on behalf of himself and all others similarly situated, asserts claims for negligence, negligence per se, and unjust enrichment. Plaintiff seeks, on behalf of himself and the Class: (i) actual, economic, and nominal damages; (ii) restitution and disgorgement of profits

1  obtained as a result of Defendants' wrongful conduct; (iii) attorneys' fees and costs of litigation; and

2  (iv) injunctive relief requiring Defendants to implement and maintain reasonable security measures

3  to safeguard PII in their custody, care, and control, to provide long-term identity theft protection for

4  Plaintiff and Class Members, and to prevent future breaches; and (v) such other relief as the Court

5  deems just and proper.

6  **PARTIES**

7  **A.    Plaintiff**

8  16.    Plaintiff Cosimo Granata is a resident and citizen of Nutley, New Jersey. Plaintiff has

9  used numerous online gaming platforms and mobile applications affiliated with Boyd Gaming

10  Corporation and/or operated by its wholly owned subsidiary, Pala Interactive LLC. Since 2013,

11  through these platforms, Plaintiff created user accounts, provided personal and identifying

12  information, and participated in online gaming activities. Although Plaintiff is not certain which

13  specific platforms were operated directly by Pala, he believes that one or more, and possibly all, of

14  the online gaming applications through which he played were managed, hosted, or otherwise

15  maintained by Pala on behalf of Boyd.

16  17.    Plaintiff received a written notice dated September 24, 2025, from Pala Interactive

17  LLC informing him that his personal information, including his name, date of birth, and Social

18  Security number, had been compromised in a cyber incident that occurred between September 5 and

19  September 7, 2025. A true and correct copy of this notice is attached hereto as **Exhibit A**. As a result

20  of the Data Breach, Plaintiff's personally identifiable information was exposed to unauthorized third

21  parties, placing him at an increased and continuing risk of identity theft, fraud, and misuse of his

22  personal data.

23  **B.    Defendants**

24  18.    Defendant Boyd Gaming Corporation is a corporation organized under the laws of

25  the State of Nevada, with its principal place of business located at 6465 South Rainbow Boulevard,

26  Las Vegas, Nevada 89118. Boyd owns and operates numerous gaming and entertainment properties

27  throughout the United States, as well as online gaming platforms developed and maintained by its

28  wholly owned subsidiary, Pala Interactive LLC.

19.     Defendant Pala Interactive LLC is a limited liability company organized under the laws of Delaware, with its principal place of business located at P.O. Box 989728, West Sacramento, California 95798-9728. Pala provides online gaming and technology services, including internet and mobile gaming platforms, on behalf of Boyd Gaming Corporation.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the putative Class, as defined below, is a citizen of a state other than that of Defendants, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

21.     This Court has general personal jurisdiction over Defendant Boyd Gaming Corporation because it is a Nevada corporation with its principal place of business located in Las Vegas, Nevada. Boyd maintains substantial, continuous, and systematic contacts with the State of Nevada and is therefore subject to this Court's general jurisdiction.

22.     This Court has specific personal jurisdiction over Defendant Pala Interactive LLC because it is a wholly owned subsidiary of Boyd Gaming Corporation that conducts substantial business in Nevada, including the operation and management of online gaming platforms for Boyd's Nevada-based properties and customers. Pala's collection, storage, and maintenance of personal information for Boyd customers gives rise to the claims asserted in this action.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Boyd Gaming Corporation resides in this District, Pala Interactive LLC conducts substantial business in this District through its parent company, and a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District, including Defendants' collection, storage, and failure to protect the personally identifiable information of Plaintiff and the Class Members.

## FACTUAL BACKGROUND

**A.     Defendants Collect, Store, and Maintain Personally Identifiable Information**

24.     Boyd Gaming Corporation ("Boyd") is one of the largest gaming and entertainment companies in the United States, owning and operating numerous casinos, hotels, and online gaming

platforms across multiple states. According to Boyd's 2024 Annual Report filed with the U.S. Securities and Exchange Commission ("SEC"), Boyd generated approximately $3.9 billion in revenue during fiscal year 2024 and serves millions of customers through its brick-and-mortar and online operations.[1]

25.     Boyd represents on its website that it "takes the privacy and security of our customers seriously" and that it "is committed to maintaining the confidentiality and integrity of personal information collected through its gaming, hotel, and online operations."[2] Boyd further asserts that it complies with all "applicable privacy and data protection laws" and implements "reasonable measures to protect customer information from unauthorized access or disclosure."[3]

26.     Boyd's Privacy Policy states that it "uses a combination of administrative, technical, and physical safeguards designed to protect the confidentiality, integrity, and security of personal information collected through Boyd's websites, mobile applications, and gaming systems."[4]

27.     Boyd and its wholly owned subsidiary, Pala Interactive LLC ("Pala"), collect, store, and maintain extensive personally identifiable information ("PII") from customers who register for online gaming accounts, player loyalty programs, or other related services. This information includes, but is not limited to, names, postal addresses, email addresses, phone numbers, dates of birth, and government identification numbers such as Social Security numbers. Defendants also collect and store financial account information, payment card data, and gaming activity records.[5]

28.     According to Pala's Privacy Policy, Pala "collects, uses, and processes personal information from players for purposes of account registration, identity verification, compliance with gaming regulations, and customer service."[6] Pala's public-facing materials state that it "is committed to maintaining appropriate safeguards to protect the confidentiality and security of user information."[7]

---

[1] Boyd Gaming Corp., Annual Report (Form 10-K) (Feb. 28, 2025).
[2] Boyd Gaming Corp., Privacy Policy, *BoydGaming.com* (last visited Oct. 8, 2025).
[3] *Id.*
[4] *Id.*
[5] *Id.*; Pala Interactive LLC, Privacy Policy, *PalaInteractive.com* (last visited Oct. 8, 2025).
[6] Pala Interactive LLC, Privacy Policy, *PalaInteractive.com* (last visited Oct. 8, 2025).
[7] *Id.*

29.     Pala represents that it "uses industry-standard security measures to protect sensitive data," including "firewalls, encryption, access controls, and intrusion detection systems designed to prevent unauthorized access."[8] Pala also claims that it "regularly reviews its systems and procedures to identify and mitigate potential security risks."[9]

30.     Pala's Privacy Policy further provides that it "retains personal information only as long as necessary to fulfill the purposes for which it was collected or as required by applicable laws and regulations."[10]

31.     According to Boyd's 2024 SEC filings, its online gaming operations—conducted through Pala Interactive—are a material and growing component of Boyd's business portfolio. Boyd's annual report highlights "interactive gaming" as a key source of customer engagement and revenue, making the data systems managed by Pala critical to Boyd's operations.[11]

32.     Boyd's public statements declare that it "implements strict measures to protect guest and player information" and "strives to provide a safe and secure environment for all users of Boyd's online and mobile gaming platforms."[12]

33.     Pala similarly advertises that it "uses encryption, secure servers, and restricted access to protect personal information" and that its systems "are designed to safeguard against unauthorized access, misuse, or alteration of user data."[13]

34.     Both Boyd and Pala acknowledge the sensitivity of the personal and financial data they collect and represent that they are committed to protecting it from misuse, unauthorized access, and disclosure.[14] Despite these representations, Defendants failed to adequately secure and safeguard the systems and networks on which they stored customer data.

35.     As a result of these failures, unauthorized third parties were able to access and exfiltrate sensitive personal information belonging to Plaintiff and Class Members during a cybersecurity incident that occurred between September 5 and September 7, 2025.

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Boyd Gaming Corp., Annual Report (Form 10-K) (Feb. 28, 2025).
[12] Boyd Gaming Corp., Corporate Responsibility Report, *BoydGaming.com* (last visited Oct. 8, 2025).
[13] Pala Interactive LLC, Privacy Policy, *PalaInteractive.com* (last visited Oct. 8, 2025).
[14] *Id.*

36.     Defendants' failure to implement reasonable and appropriate data security measures proximately caused the Data Breach and the resulting harm to Plaintiff and the Class, including the unauthorized disclosure of sensitive PII and an increased risk of identity theft, fraud, and other misuse.

**B.      The Data Breach Exposed Valuable PII**

37.     On or about September 24, 2025, Pala Interactive LLC issued a written notice to affected individuals, including Plaintiff, advising that it had experienced a data security incident involving unauthorized access to its computer systems.

38.     According to the notice, the investigation determined that between September 5 and September 7, 2025, an unauthorized third party gained access to certain Pala Interactive systems and exfiltrated files containing personal information of individuals associated with Boyd Gaming Corporation's online gaming operations.

39.     The data impacted by the breach included names, dates of birth, and Social Security numbers of current and former customers. Pala acknowledged that this information "may have been accessed or acquired without authorization" and that it had taken steps to notify affected individuals and law enforcement.

40.     Upon information and belief, the Pala Data Breach resulted from Defendants' failure to implement and maintain adequate security measures to protect sensitive customer data stored within their systems. Specifically, Defendants failed to employ appropriate intrusion detection, monitoring, and access control protocols; failed to encrypt sensitive PII; and failed to timely identify and contain the intrusion once it occurred.

41.     Despite Boyd's and Pala's representations that they use "industry-standard" or "state-of-the-art" security safeguards, the Data Breach demonstrates that Defendants did not adhere to well-established cybersecurity standards and frameworks, including those promulgated by the National Institute of Standards and Technology ("NIST").[15]

---

[15] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (Version 1.1, Apr. 16, 2018).

42.     Defendants' failures directly caused the exposure and exfiltration of valuable personally identifiable information belonging to Plaintiff and the Class Members, including data that can be used to commit identity theft, fraud, and other financial crimes.

43.     Boyd and Pala were aware, or reasonably should have been aware, of the significant and growing risk of cyberattacks targeting companies that collect and store large amounts of consumer PII, particularly within the gaming industry, which has experienced numerous breaches in recent years.[16] Despite this knowledge, Defendants failed to take reasonable steps to prevent or mitigate such an attack.

44.     As of the date of this filing, Defendants have not provided a full or transparent accounting of the Data Breach, including how the attackers gained access to their systems, what vulnerabilities were exploited, whether the stolen data was encrypted, or whether it has been recovered or contained.

45.     Defendants' failure to timely detect, contain, and disclose the Data Breach deprived Plaintiff and Class Members of critical information needed to protect themselves from the misuse of their PII, exacerbating the harm and ongoing risk they face.

**C.     Defendants Had Ample Notice That They Were Likely Cyberattack Targets**

46.     At all relevant times, Defendants knew, or should have known, that the PII they were entrusted with was a prime target for malicious actors, particularly given the nature of their gaming and entertainment operations. Defendants knew this given the unique type and the significant volume of data on their networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the PII would harm.

47.     As custodians of Plaintiff's and Class Members' PII, Defendants knew or should have known the importance of protecting their PII, and of the foreseeable consequences and harms to such persons if any data breach occurred.

---

[16] See, e.g., U.S. Dep't of Homeland Sec., *Gaming Industry Cybersecurity Risk Assessment Report* (2023).

48. According to the Consumer Financial Protection Bureau, the number of data breach and identity theft complaints it received grew from 14,319 in 2020 to 32,469 in 2022.[17] It is well known among companies that PII such as social security numbers and financial information is valuable, including information collected through online gaming platforms and frequently targeted by criminals.

49. The Federal Trade Commission has warned consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[18]

50. In April 2020, ZDNet reported that "ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip  journalists to generate negative news for companies as revenge against those who refuse to pay."[19] The gaming and hospitality industry has since become a frequent target of such attacks due to its large customer databases and online account systems.

51. Criminals can commit all types of fraud, including: obtaining a driver's license or official identification card in the victim's name but the thief's picture, using the victim's name and SSN to obtain government benefits, obtaining loans or lines of credit, and filing a fraudulent tax return using the victim's information. Identity thieves may obtain a job using the victim's social security number, rent a house, or give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[20]

---

[17] *See Compromised: Why experts say data breaches are on the rise,* NBC 6 SOUTH FLORIDA, https://www.nbcmiami.com/responds/compromised-why-experts-say-data-breaches-are-on-the-rise/3473306/ (last accessed June 5, 2025).

[18] *See* What to Know About Identity Theft, FEDERAL TRADE COMMISSION (Sept. 2024), https://consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed June 5, 2025).

[19] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Sept. 1, 2025).

[20] *See* Warning Signs of Identity Theft, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed June 5, 2025).

52.     Defendants' security obligations were especially important due to the sharp rise in ransomware and data-theft incidents targeting the gaming and hospitality industries in recent years.

53.     Defendants knew or should have known that as large gaming and entertainment corporations, they are prime targets of ransomware actors. Defendants also knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack.

**D.     Defendants Breached Their Duties to Plaintiff and Class Members and Failed to Comply with Regulatory Requirements and Industry Practices.**

54.     Because Defendants were entrusted with PII at all times herein relevant, Defendants owed to Plaintiff and the Class a duty to exercise reasonable care in collecting, storing, maintaining, and safeguarding the PII in their possession, custody, and control, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems. Defendants also owed a duty to safeguard PII because they were on notice that they were handling highly valuable data and knew there was a significant risk they would be targeted by cybercriminals. Furthermore, Defendants knew of the extensive, foreseeable harm that would ensue for the victims of a data breach, and therefore also owed a duty to reasonably safeguard that information.

55.     Security standards commonly accepted among businesses like Defendants that store PII, including gaming and hospitality companies like Defendants, include, without limitation:

      i.      Maintaining a secure firewall configuration;

      ii.     Monitoring for suspicious or irregular traffic to servers or networks;

      iii.    Monitoring for suspicious credentials used to access servers or networks;

      iv.     Monitoring for suspicious or irregular activity by known users;

      v.      Monitoring for suspicious or unknown users;

      vi.     Monitoring for suspicious or irregular server requests;

      vii.    Monitoring for server requests for PII;

      viii.   Monitoring for server requests from VPNs; and

ix.     Monitoring for server requests for Tor exit nodes.

56.     The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[21] and protection of PII, which includes basic security standards applicable to all types of businesses.[22]

57.     The FTC recommends that businesses:

i.      Identify all connections to the computers where sensitive information is stored.

ii.     Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

iii.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

iv.     Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

v.      Pay particular attention to the security of their web applications, the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

vi.     Use a firewall to protect their computers from hacker attacks while they are connected to a network, especially the internet.

vii.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information

---

[21] Start with Security: A Guide for Business, FTC (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[22] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

is stored. Set access control settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

viii.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

ix.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business network, the transmission should be investigated to make sure it is authorized.

58.    As described further below, Defendants' duty to safeguard PII is further informed by Section 5 of the Federal Trade Commission Act ('FTC Act'), 15 U.S.C. § 45, which requires companies to employ reasonable security practices to protect consumer data to ensure that all information they received, maintained, and stored was secure. This statute was enacted to protect Plaintiff and the Class Members from the type of conduct in which Defendants engaged, and the resulting harms Defendants proximately caused Plaintiff and the Class Members.

59.    Under the FTC Act, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

60.    Defendants breached their duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII by failing to implement and maintain adequate data security measures to safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII within their systems and networks, failing to monitor their systems and networks to promptly identify and thwart suspicious activity, allowing unmonitored and unrestricted access to unsecured PII, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Members' confidential and private information. Additionally, Defendants breached their duty by utilizing outdated and ineffectual data security measures, which deviated from

standard industry best practices at the time of the Data Breach. Through these actions, Defendants also violated their duties under the FTC Act.

61.     Defendants failed to prevent the Data Breach. Had Defendants properly maintained and adequately protected their systems, servers, and networks, the Data Breach would not have occurred.

62.     Additionally, the law imposes an affirmative duty on Defendants to timely disclose the unauthorized access and theft of PII to Plaintiff and Class Members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their private information. Defendants further breached their duties by failing to provide any notice of the Data Breach to Plaintiff and Class Members. In so doing, Defendants actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members.

**E.    The Experiences of Plaintiff**

63.     Plaintiff has been a customer and user of online gaming platforms affiliated with Boyd Gaming Corporation and/or operated by its wholly owned subsidiary, Pala Interactive LLC, for several years. Through these platforms, Plaintiff created accounts, verified his identity, and provided personal information, including his name, date of birth, and Social Security number, in order to participate in online gaming activities.

64.     Upon information and belief, Pala Interactive collected and maintained Plaintiff's personal information on behalf of Boyd as part of its management and operation of Boyd's online gaming platforms and related systems.

65.     Plaintiff trusted that Defendants would use reasonable and industry-standard measures to protect his personal information in accordance with state and federal data protection requirements. Plaintiff also believed that a major gaming company such as Boyd, and its technology subsidiary Pala, would have adequate safeguards in place to prevent unauthorized access to customer data.

66.    Upon learning of the Data Breach, Plaintiff reviewed the notice issued by Pala Interactive and attempted to obtain additional information regarding the incident, including what specific data was compromised and how the intrusion occurred.

67.    Within the past year, Plaintiff froze his credit with major credit bureaus as a precautionary measure to protect his personal and financial information. Despite this safeguard, Plaintiff remains concerned that the exposure of his personal information, including his Social Security number and date of birth, creates an ongoing and substantial risk of identity theft, fraud, and misuse of his data.

68.    As a proximate result of the Data Breach, Plaintiff will continue to spend time for the foreseeable future monitoring his financial accounts, reviewing his credit reports, and taking other preventive measures to protect himself against potential fraud. This time and effort constitutes a concrete injury, as it represents lost time and resources that cannot be recaptured.

69.    Plaintiff has experienced fear, anxiety, stress, and frustration because his sensitive personal information was stolen in the Data Breach and remains in the hands of unknown third parties. These harms go beyond mere worry or inconvenience and constitute actual injury recognized by law for victims of data breaches.

70.    Plaintiff has suffered actual injuries in the form of damages to and diminution in the value of his PII, which was compromised as a direct and proximate result of the Data Breach.

71.    Plaintiff has also suffered imminent and ongoing injury arising from the substantially increased risk of fraud, identity theft, and other misuse resulting from his PII being obtained by unauthorized third parties and potentially cybercriminals.

72.    Plaintiff maintains a continuing interest in ensuring that his PII, which remains within Defendants' possession, custody, and control, is properly protected and safeguarded against future data breaches and cybersecurity incidents.

73.    Defendants deprived Plaintiff of the earliest opportunity to mitigate the harmful effects of the Data Breach by failing to promptly and adequately notify him of the incident. It is unknown how long Defendants waited to notify Plaintiff and other affected individuals, and to date

Defendants have not provided a full and transparent accounting of the cause, scope, or details of the Data Breach.

     **F.**      **<u>Plaintiff and the Class Suffered Actual and Impending Injuries Resulting from the Data Breach</u>**

    74.     As a proximate result of Defendants' unreasonable security, identity thieves now possess the sensitive PII of Plaintiff and the Class. That information is extraordinarily valuable on the black market and causes direct financial and consequential harm to victims, including Plaintiff and the Class. On the dark web—an underground Internet black market—criminals openly buy and sell stolen PII to create "identity kits" worth up to $2,000 each that can be used to fabricate identities, gain access to financial accounts, open new credit lines, file false tax returns, submit fraudulent insurance claims, or incur other unauthorized charges.[23] And, "[t]he damage to affected [persons] may never be undone."[24]

    75.     Unlike the simple credit-card breaches at retail merchants, these damages cannot be avoided by canceling and reissuing plastic cards or closing an account. Identity theft is far more pernicious than credit card fraud. Criminals' ability to open entirely new accounts—not simply prey on existing ones—poses far more dangerous problems. Identity thieves can retain the stolen information for years until the controversy has receded because victims may become less vigilant in monitoring their accounts as time passes. Then, at any moment, the thief can take control of a victim's identity, resulting in thousands of dollars in losses and lost productivity. The U.S. Department of Justice has reported that in 2021, identity theft victims spent on average about four hours to resolve problems stemming therefrom and that the average financial loss experienced by an

---

[23] Nick Culbertson, *Increased Cyberattacks on Healthcare Institutions Shows the Need for Greater Cybersecurity* (Jun. 7, 2021), Forbes, https://www.forbes.com/sites/forbestechcouncil/2021/06/07/increased-cyberattacks-on-healthcare-institutions-shows-the-need-for-greater-cybersecurity/?sh=ca928c05650d.

[24] *Id.*

identity theft victim was $1,160 per person.[25] Additionally, about 80% of identity theft victims reported some form of emotional distress resulting from the incident.[26]

76.    As a consequence of the Data Breach, Class Members' credit profiles can be destroyed before they even realize what happened, and they may be unable to legitimately borrow money, obtain credit, or open bank accounts. Class Members can be deprived of legitimate tax refunds or, worse yet, may face state or federal tax investigations due to fraud committed by an identity thief. And even the simple preventive step of adding oneself to a credit-fraud watch list to guard against these consequences substantially impairs Class Members' ability to obtain additional credit. In fact, many experts advise victims to place a freeze on all credit accounts, making it impossible to rent a car, apply for student loans, buy or rent big-ticket items, or complete a major new car or home purchase.

## CLASS ACTION ALLEGATIONS

77.    Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), and where applicable, 23(c)(4), Plaintiff seeks certification of the following Nationwide Class and the Pala Subclass (collectively, the "Class"):

> **Boyd Nationwide Class:** All persons in the United States whose personally identifiable information was compromised in the September 2025 data breach involving Boyd Gaming Corporation's systems or data ("Class Member").

> **Pala Subclass:** All persons in the United States whose personally identifiable information was compromised in the same September 2025 data breach and who received a data breach notice directly from Pala Interactive LLC, or whose information was stored on Pala Interactive systems at the time of the breach ("Subclass Member").

78.    Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded

---

[25] Erika Harrell and Alexandra Thompson, Victims of Identity Theft, 2021, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS (Oct. 2023), *available at* https://bjs.ojp.gov/document/vit21.pdf.

[26] *Id.*

from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

79.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and 23(b)(3), and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

80.    _Numerosity Under Rule 23(a)(1)_. The Class is so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all members of the Class in a single action will provide substantial benefits to the parties and the Court. Upon information and belief, Plaintiff estimates that the Class is comprised of millions of Class Members. The Class is sufficiently numerous to warrant certification.

81.    _Commonality Under Rule 23(a)(2)_. Common legal and factual questions exist that predominate over any questions affecting only individual members of the Class. These common questions, which do not vary among members of the Class, and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a.    Whether Defendants knew or should have known that their computer systems and networks were vulnerable to unauthorized third-party access or a cyberattack;

b.    Whether Defendants failed to utilize and maintain adequate and reasonable security and preventive measures to ensure that their computer systems and networks were protected;

c.    Whether Defendants failed to take available steps to prevent and stop the Data Breach from occurring;

d.    Whether Defendants failed to comply with their own policies and applicable laws, regulations and industry standards relating to data security;

e.    Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their PII;

f.    Whether Defendants breached any duty to protect the PII of Plaintiff and Class Members by failing to exercise due care in protecting their sensitive and private information;

g.      Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the breach of their systems, resulting in the loss of the PII of Plaintiff and Class Members.

h.      Whether Defendants provided timely, accurate, and sufficient notice of the Data Breach to Plaintiff and the Class Members;

i.      Whether Plaintiff and Class Members have been damaged by the wrongs alleged and are entitled to actual, statutory, or other forms of damages and other monetary relief; and

j.      Whether Plaintiff and Class Members are entitled to injunctive or equitable relief, including restitution.

82.      *Typicality Under Rule 23(a)(3)*. Plaintiff's claims are typical of the claims of the Class. Plaintiff had his PII compromised in the Data Breach. Defendants' uniformly unlawful course of conduct injured Plaintiff and Class Members.

83.      *Adequacy of Representation Under Rule 23(a)(4)*. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and consumer protection class action matters such as this action, and Plaintiff and his counsel intend to vigorously prosecute this action for the Class's benefit and have the resources to do so. Plaintiff and his counsel have no interests adverse to those of the other members of the Class.

84.      *Predominance and Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of each Class Member's claim is impracticable. The damages, harm, and losses suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Even if each Class Member could afford individual litigation, the Court system could not. It would be unduly burdensome if tens of thousands of individual cases or more proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those individuals with equally meritorious claims. Individual litigation would increase the expense and delay to all parties

and the Courts because it requires individual resolution of common legal and factual questions. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

85.    As a result of the foregoing, class treatment under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and (c)(4) is appropriate.

### FIRST CAUSE OF ACTION
**Negligence and Negligence *Per Se***
**(On Behalf of Plaintiff and the Nationwide Class, and the Pala Subclass)**

86.    Plaintiff incorporates the above allegations as if fully set forth herein.

87.    Because Defendants were entrusted with such PII at all times herein relevant, they owed to Plaintiff and the Class a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in their care, control, and custody, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems. This duty arose independently from any contract.

88.    Defendants knew, or should have known, of the risks inherent in collecting and storing massive amounts of PII, including the importance of adequate data security and the high frequency of ransomware attacks and well-publicized data breaches. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that sensitive information. Indeed, on their websites, Defendants commit to data privacy, including safeguarding PII.

89.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and the Class's PII by failing to limit access to this information to unauthorized third parties and by not properly supervising both the way the PII was stored, used, and exchanged, and those in their employ responsible for such tasks.

90.    Defendants owed to Plaintiff and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Defendants also owed a duty to

timely and accurately disclose to Plaintiff and Class Members the scope, nature, and circumstances of the Data Breach. This duty is required and necessary for Plaintiff and the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

91.     Defendants also had a common law duty to prevent foreseeable harm to others. Defendants had full knowledge of the sensitivity and high value of the PII that they stored and the types of foreseeable harm and injury-in-fact that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed, leaked, accessed, or exfiltrated. Defendants' conduct created a foreseeable and unreasonable risk of harm to Plaintiff and Class Members, who were the foreseeable victims of Defendants' inadequate data security practices.

92.     Defendants violated their duty to implement and maintain reasonable security procedures and practices, including through their failure to adequately restrict access to their systems that held millions of individuals' PII or encrypt or anonymize such data. Defendants' duty included, among other things, designing, maintaining, and testing their information security controls to ensure that PII in their possession was adequately secured by, for example, encrypting or anonymizing sensitive personal information, installing intrusion detection and deterrent systems and monitoring mechanisms, and using access controls to limit access to sensitive data.

93.     Defendants' duty of care also arose pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), under which Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

94.     The FTC Act was enacted to protect Plaintiff and the Class Members from the type of wrongful conduct in which Defendants engaged.

95.     Defendants' violation of the FTC Act and comparable state consumer protection and data-security statutes constitutes negligence per se for purposes of establishing the duty and breach elements of this claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the types of harm that resulted from the Data Breach.

96.     Defendants breached their duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII by failing to implement and maintain adequate data security measures to

safeguard Plaintiff's and Class Members' sensitive personal information, failing to encrypt or anonymize PII within their systems and networks, failing to monitor their systems and networks to promptly identify and thwart suspicious activity, failing to delete and purge PII no longer necessary for its provision of services to their clients and customers, allowing unmonitored and unrestricted access to unsecured PII, and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiff's and Class Members' confidential and private information. Additionally, Defendants breached their duty by utilizing outdated and ineffectual data security measures, which deviated from standard industry best practices at the time of the Data Breach. Through these actions, Defendants also violated their duties under the FTC Act.

97. The law imposes an affirmative duty on Defendants to timely disclose the unauthorized access and theft of PII to Plaintiff and Class Members so that they can take appropriate measures to mitigate damage, protect against adverse consequences, and thwart future misuses of their private information. Defendants further breached their duties by failing to provide any notice of the Data Breach to Plaintiff and Class Members. In so doing, Defendants actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiff and Class Members. Timely disclosure was necessary so that Plaintiff and Class Members could, among other things: (i) purchase identity theft protection, monitoring, and recovery services; (ii) flag asset, credit, and tax accounts for fraud; (iii) purchase or otherwise obtain credit reports; (iv) place or renew fraud alerts on a quarterly basis; (v) closely monitor loan data and public records; and (vi) take other meaningful steps to protect themselves and attempt to avoid or recover from identity theft and other harms.

98. In Fiscal Year 2025, Salesforce reported revenue of $37.9 billion and accordingly had the financial and personnel resources necessary to prevent the Data Breach.

99. In Fiscal Year 2024, TransUnion reported a revenue of $4.184 billion and accordingly had the financial and personnel resources necessary to prevent the Data Breach.

100. Defendants nevertheless failed to adopt reasonable data security measures, in breach of the duties they owed to Plaintiff and Class Members.

101.    Plaintiff and Class Members had no ability to protect their PII once it was in Defendants' possession and control. Defendants were in an exclusive position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

102.    But for Defendants' breach of duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen. As a result of Defendants' negligence, Plaintiff and Class Members suffered and will continue to suffer the various types of damages alleged herein. There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class Members.

103.    As a direct and traceable result of Defendants' negligence, Plaintiff and the Class have suffered or will suffer an increased and impending risk of fraud, identity theft, damages, embarrassment, humiliation, frustration, emotional distress, and lost time and out-of-pocket costs to mitigate and remediate the effects of the Data Breach. These harms to Plaintiff and the Class include, without limitation: (i) loss of the opportunity to control how their personal information is used; (ii) diminution in the value and use of their personal information entrusted to Defendants; (iii) the compromise and theft of their personal information; (iv) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and unauthorized use of financial accounts; (v) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including increased costs to use credit, credit scores, credit reports, and assets; (vi) unauthorized use of compromised personal information to open new financial and other accounts; (vii) continued risk to their personal information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the personal information in their possession; and (viii) future costs in the form of time, effort, and money they will expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

104.    Defendants' negligence was gross, willful, wanton, and warrants the imposition of punitive damages given the clear foreseeability of a hacking incident, the extreme sensitivity of the private information under Defendants' care, and their failure to take adequate remedial steps, including prompt notification of the victims, following the Data Breach.

105.    Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate long-term identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

### SECOND CAUSE OF ACTION
**Breach of Implied Contract**
*(On Behalf of Plaintiff and the Nationwide Class, and the Pala Subclass)*

106.    Plaintiff incorporates the above allegations as if fully set forth herein.

107.    Defendants entered into agreements with consumers, including Plaintiff and Class Members, to provide online gaming and related entertainment services.

108.    These agreements were made expressly for the benefit of Plaintiff and the Class, as Defendants represented that they would safeguard and protect customers' confidential and private information and would timely and accurately notify affected individuals if such information were compromised.

109.    Plaintiff and Class Members were required to provide their personal information to Defendants to register for and use Defendants' online gaming applications and services.

110.    Defendants acquired, stored, and maintained this information as part of providing their services.

111.    Plaintiff and Class Members were required to provide, or authorize the transfer of, their private information in order for Defendants to provide and maintain their accounts and related services.

112.    Defendants solicited, offered, and invited consumers to provide their private information as part of their regular business practices. Plaintiff and Class Members accepted Defendants' offer and provided their private information to Defendants.

113.    When Plaintiff and Class Members provided their information to Defendants, they entered into implied contracts and understood that their information would be adequately safeguarded as part of these services.

114.    Defendants' implied promise of confidentiality to Plaintiff and Class Members includes consideration beyond any pre-existing general duties owed under state or federal law. The

additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and regulatory guidelines on data protection.

115.    Defendants' implied promises include, but are not limited to: (a) taking steps to ensure that any agents or vendors who are granted access to personal data also protect its confidentiality; (b) restricting access to qualified and trained employees; (c) designing and implementing appropriate retention and disposal policies; (d) applying or requiring proper encryption; (e) implementing multifactor authentication for access; (f) protecting customer data in compliance with applicable laws and industry standards; and (g) taking other steps to protect against foreseeable data breaches.

116.    Defendants' implied promises to safeguard Plaintiff's and Class Members' information are evidenced by representations on their websites and in their privacy policies. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants on the other, is further demonstrated by their conduct and course of dealing.

117.    Plaintiff and Class Members would not have entrusted their information to Defendants in the absence of such an implied contract. Had Defendants disclosed that they did not have adequate systems and security practices to secure sensitive data, Plaintiff and the Class would not have provided their information.

118.    Defendants recognized that this information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class Members.

119.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts.

120.    Defendants breached the implied contracts by failing to take reasonable measures to safeguard Plaintiff's and Class Members' information as described herein, and by failing to provide accurate, adequate, and timely notice that their data was compromised as a result of the breach.

121.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered and will continue to suffer damages, including: (i) the ongoing, imminent, and impending threat of identity theft, fraud, and abuse; (ii) loss of confidentiality of their stolen data;

(iii) the illegal sale of compromised data on the dark web; (iv) lost work time; and (v) other economic and non-economic harms.

122.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to strengthen their data security systems, submit to future audits of those systems, and provide adequate long-term credit monitoring and identity theft protection services to all persons affected by the Data Breach.

**THIRD CAUSE OF ACTION**
**Injunctive/Declaratory Relief**
*(On Behalf of Plaintiff and the Nationwide Class, and the Pala Subclass)*

123.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

124.    Defendants owe a duty of care to Plaintiff and Class Members, which required Defendants to adequately monitor and safeguard Plaintiff's and Class Members' PII.

125.    Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiff and Class Members.

126.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII, and the risk remains that further compromises of their private information will occur in the future.

127. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendants owe a legal duty to adequately secure the PII of Plaintiff and the Class within its care, custody, and control under the common law, and Section 5 of FTC Act;

    b. Defendants breached their duty to Plaintiff and the Class by allowing the Data Breach to occur;

    c. Defendants' existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiff and the Class within Defendants' custody, care, and control; and

    d. Defendants' ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

128. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

129. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

130. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII would be further compromised.

**FOURTH CAUSE OF ACTION**
**Violation of the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1 *et seq.*)**
*(On Behalf of Plaintiff)*

131.    Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

132.    This cause of action is brought under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1, et seq., which prohibits any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise or service.

133.    At all relevant times, Defendants engaged in trade or commerce within the meaning of the NJCFA by marketing, offering, and providing online gaming services, accounts, and related entertainment services to consumers in New Jersey, including Plaintiff.

134.    Defendants represented to Plaintiff and other New Jersey consumers, through their websites, privacy policies, and customer communications, that they employed industry-standard safeguards to protect customers' personal information and that customers could trust Defendants to maintain the confidentiality and integrity of their data.

135.    Defendants' representations were false, misleading, and deceptive because Defendants failed to implement reasonable and adequate data security measures to protect Plaintiff's and Class Members' personally identifiable information ("PII").

136.    Defendants further omitted and concealed material facts from Plaintiff and New Jersey consumers, including that:

a. Defendants' systems were vulnerable to unauthorized access and data breaches;

b. Defendants failed to implement adequate cybersecurity controls and intrusion detection systems; and

c. Defendants were not properly monitoring their networks to prevent or promptly detect such intrusions.

137.    These misrepresentations and omissions occurred in connection with Defendants' marketing and provision of online gaming services to consumers and were material to Plaintiff's

decision to register for and use those services. Plaintiff and New Jersey consumers reasonably relied on Defendants' assurances of data security when providing their personal information to Defendants.

138.    Had Plaintiff known the truth—that Defendants did not maintain adequate data security and failed to protect consumer information—he would not have provided his personal information to Defendants or would have taken additional precautions.

139.    Defendants' conduct constitutes unconscionable commercial practices, misrepresentations, and knowing omissions of material facts in violation of N.J.S.A. § 56:8-2.

140.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the New Jersey Class suffered an ascertainable loss, including but not limited to: (i) diminution in the value of their PII; (ii) the loss of benefit of their bargain with Defendants' services, which were marketed as secure; (iii) out-of-pocket costs incurred in mitigating identity theft risks; and (iv) loss of time and resources addressing the consequences of Defendants' deceptive conduct and the Data Breach.

141.    Pursuant to N.J.S.A. § 56:8-19, Plaintiff and the New Jersey Class seek treble damages, attorneys' fees, and costs of suit, as well as all other relief the Court deems just and proper.

142.    Plaintiff also seeks injunctive relief under the NJCFA, requiring Defendants to:

a. Implement and maintain reasonable data security measures consistent with industry standards;

b. Submit to periodic, independent data-security audits; and

c. Provide free, long-term credit monitoring and identity-theft protection services to all affected New Jersey consumers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

a. Certifying this action as a class action under Fed. R. Civ. P. 23 and appointing Plaintiff and his counsel to represent the Class;

b. Entering judgment for Plaintiff and the Class;

c.  Granting permanent and appropriate injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

d.  Awarding compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

e.  Award Plaintiff and Class Members statutory or punitive damages as allowed by law in an amount to be determined at trial;

f.  Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

g.  Awarding to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

h.  Awarding pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper; and

i.  Granting such further and other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: October 8, 2025                     **STRANCH, JENNINGS & GARVEY, PLLC**

_/s/ Nathan R. Ring_
Nathan R. Ring
Nevada State Bar No. 12078
3100 W. Charleston Blvd., Ste. 208
Las Vegas, Nevada 89102
(725) 235-9750
nring@stranchlaw.com

Grayson Wells*
John C. Roberts*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nashville, TN 37203
(615) 254-8801
gwells@stranchlaw.com
jroberts@stranchlaw.com

Melissa R. Emert*
Gary S. Graifman*
**KANTROWITZ, GOLDHAMER & GRAIFMAN,
P.C.**
135 Chestnut Ridge Road
Montvale, New Jersey 07645
Telephone: (201) 391-7000
Facsimile: (201) 307-1086
memert@kgglaw.com
ggraifman@kgglaw.com

*Counsel for Plaintiff Cosimo Granata and the
Putative Class*